UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------X
ALLSTATE INSURANCE COMPANY,

                    Plaintiffs,

- against -

UNITED STATES OF AMERICA,

                    Defendant.
------------------------------------------------------X

**MEMORANDUM AND ORDER**

02 CV 489 (CLP)

On January 14, 2002, plaintiff Allstate Insurance Company commenced this subrogation action against the United States of America, seeking to recover sums paid in connection with an accident that occurred between Nezir Papraniku, son of Resit Papraniku, the insured, and a Postal Service employee, Rosario Terrusa. The parties consented to have the case referred to the undersigned for all purposes, and a trial on the issue of liability was held in the case beginning on December 18, 2003. Prior to trial, the parties stipulated as to the amount of damages.

## FACTUAL BACKGROUND

A. <u>Nezir Papraniku</u>

Nezir Papraniku testified that on December 5, 2000, he was involved in an accident on Ocean Terrace in Staten Island. (Tr. at 3). The accident occurred in front of 591 Ocean Terrace[1] in an area which was described by plaintiff as "residential." (Id. at 7). At the site of the accident,

---

[1] Although plaintiff did not know the exact address, the parties do not dispute that the collision occurred somewhere in front of the residence located at 591 Ocean Terrace.

Ocean Terrace is a two lane roadway, with one lane in either direction. According to plaintiff, there are no bicycle lanes and no parking lanes reserved on the roadway at that location. (Id. at 6). Moreover, although Ocean Terrace curves in some spots, the road is straight at the point where the accident occurred. (Id. at 33–34). At the time of the accident, which occurred at approximately 1:00 p.m. in the afternoon, plaintiff was driving his father's Mercedes Benz 400 SE on Ocean Terrace. (Id. at 4–5). He was alone in the car at the time, the brakes and tires were in good working condition, and the weather was clear and dry. (Id. at 4). Plaintiff testified that he believed that there was a speed limit of 30–35 miles per hour in the vicinity of 591 Ocean Terrace. (Id. at 5).

Plaintiff testified that as he was driving up Ocean Terrace, he saw a Postal truck parked about 100 feet away on the right side of the road, "[h]alf into the roadway and half into the person's grass." (Id. at 6–7). During the trial, plaintiff identified some photographs of the scene and indicated that the Postal truck was parked partly on the lawn, several feet beyond the slate walkway leading to the residence. (Id. at 16–17; Ex. 2-F). Plaintiff conceded, however, that the Postal truck did not take up the entire lane of traffic in its parked position, and that there was enough room for plaintiff to pass the truck on its left side without crossing the double-yellow line into oncoming traffic. (Id. at 8). When the truck first came into view, plaintiff reported that he did not see any obstructions or other vehicles between his car and the truck. (Id. at 36). Plaintiff testified that he did not see any cars approaching from the opposite direction as he was about to pass and that he never lost sight of the truck from the moment he first saw it until the moment of impact. (Id. at 7).

Plaintiff testified that when he was "a couple of feet" from the postal truck, the truck

2

pulled out in front of him. (Id. at 6). Plaintiff testified that approximately "five, ten seconds" elapsed between the moment he first saw the truck and the moment of impact. (Id. at 9). According to plaintiff's version of events, the truck "started to come out into the road," travelling in the same direction as plaintiff. (Id.) When it pulled out, neither its turn signal nor its brake lights went on. (Id. at 10). Indeed, according to plaintiff, from the moment he first saw the truck, he never saw the truck put on its directional signals, lights or flashers. (Id. at 9). Plaintiff estimated that he was travelling approximately 20 to 25 miles an hour at the time of the accident. (Id. at 11). According to plaintiff, "[i]t happened so quickly" that he could not estimate how much time elapsed from when the truck started to pull out until the impact, nor did plaintiff have time to take any evasive action to avoid the accident. (Id. at 10). Plaintiff admitted that he did not slow down at all between the time he first saw the truck and the time of impact. (Id. at 42). However, his testimony at trial that he never put his foot on the brake was contradicted by his deposition testimony, where he stated that he applied his foot to the brake "[w]hen [the truck] pulled out on me." (Id. at 47–48).

On direct examination, plaintiff testified that the truck pulled out in front of him when he was only a few feet behind the truck. (Id. at 9). On cross-examination, however, plaintiff conceded that during his earlier deposition in a personal injury action brought by Mr. Terrusa, the Postal Service driver, plaintiff had stated that the truck was "an inch, a couple of inches" away from plaintiff's car when the truck began to move. (Id. at 37–39). On redirect, plaintiff reiterated his estimate that the Postal truck was five to six feet in front of him when it first started to move. (Id. at 65).

Plaintiff also testified during that earlier deposition that there was a period of "three or

four seconds" between the time he first saw the truck and the time of impact, as contrasted with his trial testimony of a five to ten second interval. (Id. at 40). Although at the time of trial, plaintiff could not state whether the truck was moving faster than plaintiff's car, plaintiff had previously testified during the deposition that the truck was moving faster than plaintiff's car. (Id. at 41–42). Moreover, while he testified at trial that he was travelling 20 to 25 miles per hour the entire time (id. at 42), he testified at his deposition that he was travelling "[b]etween 28 and 25" miles per hour. (Id. at 43). Plaintiff also did not recall telling the police officer who filled out the accident report that he was going 25 to 30 miles per hour. (Id. at 44; Ex. R). In fact, contrary to plaintiff's testimony that the speed limit on Ocean Terrace was 30 to 35 miles per hour, a photograph of the speed limit sign that is situated immediately prior to the location of the accident demonstrates that the speed limit in the vicinity of 591 Ocean Terrace was actually 20 miles per hour. (Id. at 45–46; Ex. N-9).

As a result of the impact, plaintiff's headlights hit the mail truck on the left rear side of the truck. (Id. at 10–11). After he struck the Postal vehicle, plaintiff got out of his car and found the driver on the roadway. (Id.)[2] Plaintiff testified that he picked up the driver and walked him to a tree. (Id.) He testified that the Postal worker looked fine, did not ask for any help, and did not ask plaintiff to call an ambulance. (Id. at 59). Plaintiff nevertheless called an ambulance and at least one responded to the scene, along with police and fire engines. (Id. at 59–60).

Plaintiff testified that prior to the impact, he never saw the Postal Service driver outside his vehicle, nor did he know that the driver was in the vehicle at the moment of impact. (Id. at

---

[2]According to plaintiff, the driver's entire body was in the street; it was not on the grass at all. (Id. at 13).

4

24). According to plaintiff's trial testimony, the driver was conscious when plaintiff first saw him after the collision. (Id.) He spoke to the plaintiff, stating that "he was all right."³ (Id.) He also told plaintiff that "it was his fault and that his company would pay for everything." (Id. at 26–27). On cross-examination, however, it was pointed out that during his deposition, plaintiff testified that the Postal driver was "regaining consciousness [. . .] [w]hen I got there." (Id. at 58). Then, at trial he testified that he had "no idea" whether the driver was "regaining consciousness" at the time the plaintiff first saw him. (Id. at 57).

After calling an ambulance, plaintiff called his mother on his cell phone and she arrived at the scene approximately ten minutes later. (Id. at 27, 60). His mother also spoke to the driver of the Postal vehicle. (Id. at 27–28). According to plaintiff, the driver told plaintiff's mother that he was all right and that his company would pay for the car. (Id. at 28–29).

As a result of the collision, plaintiff's car ended up in the middle of the lane and the Postal truck came to rest "against the bushes of somebody's house" across the street, having travelled approximately 100 feet to the left and one house up the street as a result of the impact. (Id. at 12). Plaintiff testified that the vehicle he was driving was damaged in the accident and

---

³ Defendant objected to this testimony as inadmissible hearsay since Mr. Terrusa was not a party to this subrogation action. Although defendant is correct that the testimony is not admissible as an admission of a party-opponent, Fed. R. Evid. 801(d)(2), it is admissible as an excited utterance, which requires that the declarant make a statement relating to a startling event or condition while the declarant is still under the stress of excitement caused by the event or condition, as is the case here. Fed. R. Evid. 803(2); see also Idaho v. Wright, 497 U.S. 805, 820 (1990) (setting forth the rationale for the excited utterance exception). In addition, because Mr. Terrusa's alleged statement was against his pecuniary or proprietary interest, or might have subjected him to civil liability, it is admissible as an assertion against interest. Fed. R. Evid. 804(b)(3); see also Chambers v. Mississippi, 410 U.S. 284, 298–99 (1973) (setting forth rationale for rule). In any event, this Court has determined that these statements by the witness are not determinative of liability given all the other circumstances at issue. See discussion *infra* at 16–18.

was taken away by tow truck. (Id. at 21, 23).

Plaintiff conceded on cross-examination that at the time of the accident in December, 2000, he had only had his full driver's license, which authorized him to drive alone without his parents, since October 30, 2000 - - less than two months prior to the accident. (Id. at 29–30) He further conceded that he had only driven a couple of times a week on his own since getting his license in October (id. at 31), and that he had his radio on at the time of the accident (Id. at 34).

Plaintiff was, however, familiar with Ocean Terrace because it was the route he normally took to go to work. (Id. at 32). Plaintiff testified that generally there is not a lot of traffic on Ocean Terrace (id. at 33), and that there is a "no standing" sign immediately after the accident scene. (Id. at 66–67; Ex. 3-A).

B. Ramize Papraniku

Ramize Papraniku, the mother of the plaintiff, testified over defendant's objection.[4] (Id. at 79). She testified that she received a call from her son from the accident scene and that she arrived at the location five to ten minutes later. (Id. at 80). When she first saw the driver, he was conscious and standing on the lawn. (Id. at 81). She asked him if he was all right and he said he was. (Id.) He "apologized for what had happened" and told her that "the damages would be

---

[4] The attorney for Allstate objected to allowing Mrs. Papraniku to testify, asserting that her testimony would be hearsay and irrelevant because she did not witness the accident itself, that her testimony would be duplicative of Nezir Papraniku's testimony, and on the grounds that her name was not properly disclosed prior to trial pursuant to F.R.C.P. 26. (Tr. at 74–75). The Court permitted the witness to testify on the limited ground of her conversation with Mr. Terrusa. (Id. at 77–78). To the extent that her testimony was within the scope of her personal knowledge, it was admissible and her testimony as to the driver's statements was admissible under an exception to the hearsay rules. See n.3, *supra*. In addition, this Court has not relied on this witness's testimony in making its ultimate determination.

taken care of." (Id.) She denied that he ever said the accident was his fault. (Id. at 83).

C. Rosario Terrusa

Rosario Terrusa, formerly employed by the United States Postal Service,[5] testified that prior to the accident on December 5, 2003, he had been employed as a letter carrier for the Postal Service since 1970. (Id. at 101). He testified that he had been delivering mail using a motor vehicle for approximately 25–26 years prior to the accident and he had been driving the same truck for five to six years. (Id. at 102–03). He testified that he typically worked five days per week. (Id. at 103).

On December 5, 2000, the day of the accident, Mr. Terrusa was working a 7:30 a.m. to 4:00 p.m. shift. He was driving the same route he had driven for 14 years. (Id.) Mr. Terrusa testified that in the 14 years he had been driving that route, he had never had an accident. (Id. at 104). The vehicle he was driving was a "small truck," with three doors - - one in the back that slides up leading to the storage area, and one on either side of the passenger compartment that slide open and shut. (Id. at 102). Mr. Terrusa explained that the driver sits on the right side of the vehicle and on the left side is a tray for mail. (Id.)

According to Mr. Terrusa, the roadway in front of 591 Ocean Terrace was "fairly flat," with one lane of traffic in either direction divided by a double yellow line. (Id. at 104). He testified that the road was inclined and curved before 591 Ocean Terrace, but that the road is

---

[5] Mr. Terrusa testified that after the accident, he was out of work for 14 months, at which point he had reached retirement age. (Tr. at 100–01). Since he could no longer perform his job the way he used to be able to, he retired and became a mail clerk at the Staten Island Bank and Trust Company in March 2002. (Id. at 100).

straighter and more level in front of this address. (Id. at 104–05). He testified that despite the absence of any indication of lines on the roadway as depicted in the photographs, there had been a bike lane in the vicinity of 591 Ocean Terrace. (Id. at 105, 142–43).

Mr. Terrusa testified that the mailbox at 591 Ocean Terrace was located on the house, requiring him to exit his vehicle in order to deliver the mail. (Id.) On December 5, 2000, he parked his truck with his door parallel to the walkway approaching the house and with his right wheels approximately eight to ten inches from the curb. (Id. at 105–06). He denied that any portion of his vehicle was parked on the lawn. (Id. at 109). According to Mr. Terrusa, Ocean Terrace is wider than a normal single traffic lane, and there was sufficient room for other vehicles to pass to the left of his truck without crossing the double yellow line. (Id. at 109–10). The next stop on his daily route would have been on Portsmouth Avenue, which intersects Ocean Terrace between 40 to 50 feet immediately after the house at 591 Ocean Terrace. (Id. at 108–09; Ex. N-7). To get to his next stop, he would simply put the truck in drive and make a right turn onto Portsmouth; there was no need for him to pull out to the left into the traffic lane. (Id.)

Mr. Terrusa testified that on the day of the accident, he parked his truck, set the hand brake, put the vehicle in park and turned on his flashers. (Id. at 110). He then exited the truck on the right side, made his delivery, and returned to the vehicle. (Id.) He turned off his flashers, turned on the motor, and was in the process of putting on his seatbelt when he felt and heard a loud bang in the rear of the truck. (Id. at 110–11, 128). He testified that at the point of impact, the hand brake "was probably off." (Id. at 129). Although he testified that he believed the truck was in park at the time he was hit, he admitted that he was "not positive" about that. (Id. at 129–30). He testified that normally he would put his seat belt on prior to putting the truck in

8

gear. (Id. at 141). On cross-examination, he testified that at the time of impact, his foot was not on either the brake or gas pedal. (Id. at 141).

As a result of the impact, Mr. Terrusa was ejected to the right from the driver's seat though the right side door which he had not had time to shut before he was hit. (Id. at 111, 134–35). He estimated that it was a "matter of seconds" between the time he turned off his flashers and the time he was hit. (Id. at 111). He believed that he was ejected onto a dirt and gravel area in front of 591 Ocean Terrace, and denied landing in the roadway or that any portion of his body was in the roadway. (Id. at 112, 135). He described the lawn at 591 Ocean Terrace as not "a perfect lawn. There was some gravel and dirt. . . . Probably needed some repair at the time." (Id. at 135–36). He struck his head, shoulder and back when he landed and lost consciousness. (Id. at 112, 136) Mr. Terrusa testified that when he regained consciousness, a passing "good samaritan" came over and tried to assist him. (Id. at 113). Mr. Terrusa described this individual as a slim white male in his early thirties or forties. (Id.) Mr. Terrusa gave him the number to the post office and the man used his cell phone to call Mr. Terrusa's supervisor. (Id.)

When asked if Nezir Papraniku assisted him in any way, Mr. Terrusa testified that he did not. (Id. at 114). He described Mr. Papraniku as "[v]ery young, maybe twentyish," "short" and "broad": "[d]efinitely" broader than the "good samaritan." (Id.) Mr. Papraniku was present in the room during Mr. Terrusa's deposition on May 8, 2003, at which time Mr. Terrusa was asked if anyone in the room had helped him at the scene. (Id. at 155). He denied that they had. (Id.)

Some time after the accident, the ambulance arrived, along with police and fire personnel. (Id. at 114–15). They put Mr. Terrusa on a gurney because he could not move from the pain in his back, right shoulder and arm, and they cut off his clothes and tried to treat his head injury.

9

(Id.) He was bleeding from his forehead and his face in several places. (Id. at 115). He was diagnosed with a concussion or other head trauma, but denied experiencing recurring headaches or memory loss subsequent to the accident. (Id. at 137).

He was not certain if he spoke to any police officers on the scene but denied speaking to either Mr. Papraniku or his mother. (Id. at 116). He testified that he did not apologize to either of them, and denied that he ever admitted fault or told either one of them that the damages would be taken care of. (Id.)

Mr. Terrusa testified that the day after the accident, he spoke to Larry Lupo, his supervisor from the Postal Service about the accident. Mr. Terrusa identified the motor vehicle accident report that Mr. Lupo had submitted after visiting him at the hospital. (Id. at 116–17; 125; Ex. C). In the accident report, there is a section titled "[d]escribe what happened." Mr. Terrusa had dictated this section to his daughter and she wrote it down for him. (Id. at 118). The statement, which he reviewed for accuracy, states:

> Just made a delivery to 591 Ocean Terrace [. . .] by foot. When getting back into the vehicle number one. While still parked, vehicle number one was hit in rear by vehicle number two. My body was then thrown from vehicle one on the lawn in front of 591 Ocean Terrace and I [. . .] became unconscious.

(Ex. C).

Mr. Terrusa spent two days in Staten Island Hospital following the accident, had surgery from a torn rotator cuff in March, and attended physical therapy sessions three times a week for eight months. (Tr. at 120). His doctor released him from further treatment in February 2002, but Mr. Terrusa felt he could no longer do his former job because he lacked strength and could not lift things the way he used to. (Id. at 120). Accordingly, he decided to retire. (Id. at 121).

On cross-examination, plaintiff's counsel asked Mr. Terrusa if he was parked in a "no standing" or "no parking" zone at the time of the accident, to which Mr. Terrusa responded that he was "not sure. I don't recall any signs." (Id. at 138; Ex. K-28).

D. Dr. Anthony Storace

The government called Dr. Anthony Storace,[6] a consulting engineering, as an expert witness in the area of accident reconstruction. (Id. at 157). Dr. Storace, who is currently affiliated with Inner City Testing, testified that he has been consulting in the area of accident reconstruction for thirteen years and that he has been involved in injury analysis as well as mechanical engineering and safety engineering. (Id. at 157–58; 161). He has held a professional engineering license since 1970 and is a member of various professional engineering associations. (Id. at 162–63). He taught mechanical engineering at Brooklyn Polytechnic Institute and at New York Medical College from 1977–1989, and has been previously qualified and testified as an expert in the areas of accident reconstruction, mechanical engineering, and safety engineering. (Id. at 163–64).

Based on his examination of the accident site, his inspection of the Postal truck involved in the accident, and his review of various documents, including the depositions taken in the case and various accident reports, Dr. Storace offered his expert opinion that the accident was caused when plaintiff misjudged the distance between the right edge of his Mercedes and the left edge of the Postal truck. (Tr. at 192).

---

[6] Dr. Storace has a bachelor of science degree in mechanical engineering from City College, a masters of science and engineering from Columbia University and a doctorate in mechanical engineering from Brooklyn Polytechnic Institute. (Id. at 161).

11

Prior to reaching that conclusion, Dr. Storace took measurements of the distance along the roadway in front of 591 Ocean Terrace to various points from the east from where plaintiff's Mercedes had come, and to the west toward Portsmouth in the direction both vehicles were facing. (Id. at 167–68). Dr. Storace determined that a driver proceeding west up Ocean Terrace would be able to see a vehicle parked at the accident site from 265 feet away. (Id. at 170). He measured the width of the road and determined that the width of the lane to the double yellow line was thirteen (13) feet, four (4) inches in front of 591 Ocean Terrace. (Id. at 168). Based on his measurements of the width of the Postal vehicle and the Mercedes, Dr. Storace calculated that if the two vehicles were side by side, there would still be eight inches of additional roadway between them. (Id. at 169).

Dr. Storace then measured how far to the left the rear of the Postal truck could move when its steering wheel was turned fully to the left. (Id. at 176). He conducted this test because it was his understanding from plaintiff's deposition testimony that the truck started to move when the Mercedes was very close to the truck. (Id. at 181). He wanted to determine the acceleration capability of the truck in relationship with its ability to move laterally in order to determine "whether the truck was in fact capable of moving to the left enough to account for the overlap of the vehicles as demonstrated by the damage." (Id.) In measuring the truck's acceleration rate, Dr. Storace considered plaintiff's testimony that while the Mercedes initially had a clear path, the truck's movement to the left when Mr. Papraniku was four to five feet away[7] was, according to plaintiff, what caused the accident. (Id. at 182). Dr. Storace testified that if plaintiff had been

---

[7]Dr. Storace also noted that at one time, plaintiff had testified that he was only "inches" away when the truck started to move, but discounted that testimony as not possible under the circumstances. (Id. at 182).

12

traveling at 20 miles per hour, which is the equivalent of 30 feet per second, it takes one sixth of a second to travel five feet. (Id.) Based on the acceleration rate of the truck, even if it was capable of moving completely sideways, which it is not, Dr. Storace determined that in one sixth of a second, the truck would have been able to move at most 2 inches forward or one-half inch sideways. (Id. at 182–83).

Based on these measurements, Dr. Storace concluded that:

> It was impossible for that truck to move more than a half inch, so that my conclusion was that whether the truck remained stationary or whether the truck moved, as described by the driver of the Mercedes, would have made absolutely no difference. The truck was incapable of moving sideways during that time interval.

(Id. at 183).

Dr. Storace then explored the possibility that the Mercedes might have been further away than the "four to five feet" to which the plaintiff testified, giving the Postal truck enough time to move further than half an inch into the road. (Id. at 184). Dr. Storace testified that based on his measurements and the truck's acceleration capability, it would have take two seconds for the truck to pull out the distance suggested by the damage. (Id. at 185). In order for the Postal truck to have had sufficient time to move after pulling out into the road, the Mercedes would have had to have been sixty feet back. (Id. at 185). Had it been sixty feet behind the truck when the truck pulled out, the Mercedes would have had plenty of time to stop and avoid the accident, as it takes only forty feet to stop a vehicle moving at twenty miles per hour, given reaction and braking time. (Id.) However, if the Mercedes was traveling at thirty miles an hour, he would not have had enough time to stop and would have hit the truck. (Id.) Therefore, Dr. Storace concluded that this scenario - - "only other explanation that could explain the impact" - - was not consistent

13

with either plaintiff or defendant's testimony, and he therefore ruled out this explanation. (Id. at 187).

Based on his tests and measurements, Dr. Storace offered his expert opinion that the accident was caused when the Mercedes driver "simply misjudged the clearance with the truck and hit the truck as a result." (Id. at 187). He explained that:

> [I]t was physically impossible for the truck to have moved as described by the driver of the Mercedes and the only other explanation that could explain the impact was inconsistent with the testimony of both the driver of the postal truck and the driver of the Mercedes who said he was going at twenty to twenty-five miles an hour. I mean, yes, if he was speeding, forty, fifty miles an hour, clearly he could have - - that accident could have occurred. But I didn't see any reason for assuming that. So I think the most consistent . . . explanation, the explanation most consistent with the evidence is that the Mercedes simply misjudged the corner."

(Id. at 187). Dr. Storace explained that the Mercedes "is a big vehicle" that weighs more than the truck. (Id.) If plaintiff was "trying to avoid going over the yellow line, he would have been coming close to the truck. So I think it's very reasonable that he just misjudged," particularly since he was coming around a right-hand curve, and in such situations drivers "tend to hug the right side of the road." (Id. at 188). He opined that no matter whether the truck was moving or not, "[t]he truck couldn't have done anything to contribute to the accident" because plaintiff "was pointed at the rear of the truck before he hit it and the truck, if it moved, its movement did not in any way contribute to the accident. There just wasn't enough time." (Id. at 192).

He also testified that the exact location of the Postal truck at the time of the accident had no bearing on his opinion. (Id. at 218). Thus, even if the truck had been parked further up the street as plaintiff alleged, Dr. Storace's conclusions would be the same. (Id.) When asked

14

whether it would make a difference if the Postal truck had been parked partly on the lawn as plaintiff testified, Dr. Storace opined that it was "even more unreasonable to believe" that the truck pulled out in front of the Mercedes because it would have had to move even farther to the left to be hit the way it was. (Id. at 193).[8]

## DISCUSSION

Plaintiff seeks judgment in its favor, arguing that the Postal Service driver was negligent in pulling out in front of plaintiff's vehicle from a parked position, in failing to give an appropriate signal before moving left into the roadway, and in failing to yield the right-of-way to plaintiff's car prior to pulling out into the roadway. Plaintiff contends that the Postal Service driver's negligence was the proximate cause of the accident and the resulting damages, and accordingly that judgment should enter in plaintiff's favor.

In support of its position, plaintiff cites several sections of the New York Vehicle and Traffic Code, including Section 1143, which provides that persons entering the roadway "shall yield the right-of-way to all vehicles approaching on the roadway to be entered." N.Y. Vehicle & Traffic L. § 1143 (McKinney 1996). Section 1162 also prohibits a person from moving a standing or parked vehicle "unless and until such movement can be made with reasonable safety." N.Y. Vehicle & Traffic L. § 1162 (McKinney 1996). Finally, plaintiff also cites Section

---

[8]The witness also opined that the location of the debris in the photographs was not inconsistent with Mr. Terrusa's testimony that he parked the truck next to the path to the house since the debris from the Mercedes would have traveled forward after the impact with the vehicle or could have fallen off during the towing process. (Id. at 194–95). Similarly, he opined that various markings on the lawn, which plaintiff's counsel had suggested were the tire marks of the Postal truck where it was parked on the lawn, were actually made by the Mercedes' front tire during the towing process. (Id. at 195–97).

1163 which prohibits a vehicle from moving right or left "unless such movement can be done with reasonable safety" and prohibits such movement "without giving an appropriate signal." N.Y. Vehicle & Traffic L. § 1163 (McKinney 1996).[9]

Defendant contends that judgment should enter in its favor because the evidence established that Mr. Papraniku was negligent in that, by his own testimony, he was travelling faster than the speed limit and because he rear-ended the Postal Service vehicle.

The task before the Court is to determine whether either of the parties was negligent and if that negligence was the proximate cause of the accident. "As a general rule, a rear-end collision with a stopped vehicle creates a prima facie case of negligence against the operator of the following vehicle, imposing a duty of explanation." Nichols v. Turner, 6 A.D.3d 1009, 1012, 776 N.Y.S.2d 114, 117 (3d Dep't 2004). See also Leal v. Wolff, 224 A.D.2d 392, 392, 638 N.Y.S.2d 110, 112 (2d Dep't 1996) (holding that defendant's duty to maintain a safe distance between his car and plaintiff's car, combined with his failure to furnish a non-negligent explanation, constituted negligence as a matter of law). Here, plaintiff drove the vehicle which rear-ended defendant's truck. The burden is on plaintiff to furnish a non-negligent explanation.

Having considered the testimony of the witnesses at trial, including that of Dr. Storace, the accident reconstructionist, this Court finds in favor of defendant and concludes that plaintiff was negligent. Specifically, this Court finds persuasive Dr. Storace's testimony that even if the

---

[9] Plaintiff also appears to argue that the truck was illegally parked in a no standing zone. However, Section 1200(c) of the Vehicle and Traffic Law states that where parking is prohibited, a vehicle may "stop or stand temporarily for the purpose of and while actually engaged in loading or unloading merchandise or passengers." N.Y. Vehicle & Traffic L. § 1200(c) (McKinney 1996). See also New York City, N.Y., Rules, Tit. 34, § 4-08 (same).

plaintiff's story is accepted as true and the mail truck pulled out suddenly, given the turning radius and acceleration capabilities of the truck, it would have been impossible for the accident to have occurred in the manner described by plaintiff. The area of the truck damaged upon impact extended too far over to the right side of the truck to be consistent with what one would expect if the Mercedes clipped the left rear of the truck as the truck was pulling out from the curb.

Moreover, having observed the demeanor of both drivers at trial, this Court credits the testimony of Mr. Terrusa that he was in the process of putting on his seat belt at the time of impact and that he had not begun to pull out in front of plaintiff. From the photographs of the scene and the surrounding streets, it clearly appears that there would have been no need for Mr. Terrusa to pull his vehicle to the left into other traffic; the road was sufficiently wide to allow him to simply drive forward from his location in front of 591 Ocean Terrace onto his next stop. Furthermore, logic suggests that he would have driven straight, since his next stop required a right turn at Portsmouth Avenue, which was the street running perpendicular to Ocean Terrace and located immediately at the end of the property located at 591 Ocean Terrace.

By contrast, Mr. Papraniku's testimony was less than convincing and included significant inconsistencies. Among other things, his story changed with respect to how far he was from the truck when he first saw it move - - from several inches (Tr. at 39) to a few feet. (Id. at 37). With respect to how fast he was driving, he testified when deposed that he was driving 25 to 28 miles per hour (id. at 43), and then testified at trial that he was driving only 20 to 25 miles per hour. (Id. at 11). He also claimed that he never saw any lights on the truck at all - - he did not see flashers, turn signal, or brake lights. (Id. at 7–8). This Court has serious doubts that any driver

would shift from park or neutral into drive without first putting his foot on the brake.

While there may have been inconsistencies in Mr. Terrusa's story as well, this Court did not find them to be material and attributes some of his statements to the fact that he suffered a head injury and was rendered unconscious for a period of time immediately after the accident. That would explain why he may not recall speaking to Mrs. Papraniku, whom this Court found to be credible, and it may also explain why he told her he was all right, when obviously he was not, and why he may have said that the damage would be paid for. Given the other physical evidence in the case, this Court does not conclude that this latter statement, even if made by Mr. Terrusa, is conclusive as to the issue of fault.

In summary, this Court finds that based on the evidence, the most logical explanation consistent with the evidence is that Mr. Papraniku, a brand new driver, who had just gotten his license five months earlier and had only driven on his own less than a dozen times, was coming around the curve, and simply misjudged the distance between his vehicle and the parked truck. Although it is also possible that he was driving at a rate of speed that exceeded the limit at that point in the roadway, this Court does not find that to be the significant factor. Plaintiff has not proffered a non-negligent explanation for rear-ending the defendant's vehicle, and accordingly, this Court finds that plaintiff was negligent. See, e.g., Nichols v. Turner, 6 A.D.3d at 1012; Leal v. Wolff, 224 A.D.2d at 392.

Accordingly, since the parties have stipulated to the amount of damages in the case, this Court hereby awards judgment in favor of defendant in the amount stipulated to by the parties.

**SO ORDERED.**

Dated: Brooklyn, New York
       September   , 2005

                                      Cheryl L. Pollak
                                      United States Magistrate Judge
                                      Eastern District of New York